Thomas *v.* Hartshorne.

GEORGE W. THOMAS, appellant,

*v.*

JOSEPH C. HARTSHORNE, respondent.

Money was advanced to a person to be used by him in raising sunken treasure, upon his promise to return a large sum, if successful. It appearing that the further prosecution of the work by the person had become impossible—*Held*, that he must account for the moneys received, and, after certain allowances, pay back the unexpended balance.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Hartshorne* v. *Thomas, 16 Stew. Eq. 419.*

*Mr. Charles T. Glen,* for the appellant.

*Mr. Samuel C. Mount,* for the respondent.

The opinion of the court was delivered by

REED, J.

During the war of the Revolution, an English frigate, having on board a large amount of specie, sent to this continent to pay the British troops, sunk in the East river in deep water. The Hussar was the name of the ship, and the amount of gold coin supposed to have gone down in her was estimated at $4,800,000.

Several abortive efforts were made, from time to time, to recover the treasure. On the 31st of May, 1880, the defendant, Mr. George W. Thomas, entered into an agreement with the secretary of the treasury of the United States, by the terms of which agreement he, the defendant, was permitted to search for this treasure, he to have, in the event of its capture, ninety per cent. of the treasure.

The prosecution of the enterprise required boats, machinery and men, and the defendant had little or no money to secure

them.   He obtained moneys in different amounts, at different times, from a number of persons, among whom was the complainant below, Mr. Joseph C. Hartshorne.

The understanding between Thomas and those who made the advancements was, that the moneys advanced were to be used in the work required to discover and raise the sunken gold.   To each one who advanced money he gave a writing, of which the following is a specimen :

" WHEREAS, I, George W. Thomas, of the borough of Hackettstown, county of Warren, and State of New Jersey, now hold a contract made to me by the Secretary of the Treasury, on behalf of the Government of the United States of America, by which contract I am placed and now am in possession of the remains of the sunken hull of the British frigate Hussar, with all the treasure, whether in silver or gold, now or heretofore connected with said sunken hull, and lying in the East river, or Long Island sound, near Port Morris, and State of New York; and

" WHEREAS, I have received from         the sum of         dollars, the receipt whereof I hereby acknowledge,

" I do hereby agree that I will, as soon as I recover the said treasure, pay to the said         the sum of         dollars, with no delay more than will be necessary to convert the same into lawful money of the United States.

" In witness whereof, I have hereunto set my name this         day of         , A. D. 1883."

The respective sums to be repaid were from ten to fifteen times greater than the sums advanced.

On October 16th, 1882, the complainant advanced $5,000. On March 2d, 1883, he advanced an additional $5,000.   On May 13th, 1883, he advanced another $3,000, which last sum was secured by a chattel mortgage on the scow employed by Thomas in his work.   The work was prosecuted by Thomas during all the seasons of year when practicable, until January, 1884.

Those who had advanced money then called upon Thomas for an account of the amount and manner in which the moneys had been expended, which account he denied their right to require of him, and which account he refused to render.

The bill in this case was then filed by Hartshorne, on behalf of himself and others who had advanced, and who chose to come

in, for an account of, the moneys so received by the defendant. The vice-chancellor ordered a decree that an account be taken.

The defendant, upon this appeal, contends, that he is not, in equity, required to give an account of the moneys advanced to him. His counsel insists, that his contract was to repay a much larger sum than that advanced to him upon the happening of a single event, namely, the discovery of the treasure.

He admits that, springing out of the contract expressed in the written stipulation, there was an incidental obligation resting upon Thomas to proceed with reasonable diligence in the work of rescuing the treasure. But he contends, that so long as the work continued no one was entitled to inquire into the expenditure of the money advanced. If this fully expresses the extent of the duty thrown upon Thomas, then it clearly appears that, at the moment when the bill was filed, there was no right upon the part of Hartshorne to call for an account.

Up to that date the work had proceeded with all practicable expedition. It is true that the government contract was subsequently annulled, and thus Thomas was rendered impotent to pursue his work, but that was a matter arising subsequently to the original institution of this suit.

It may be admitted that, upon the discovery of this treasure, the only right of those advancing the sums would be to recover the sums stipulated for in their contracts. I also think, that so long as Thomas was in a position to prosecute and do the work with reasonable diligence and economy, Hartshorne and others had no right to recover the unexpended portion of the moneys advanced. Nevertheless, it seems clear, that the nature of the contract and the character of the event upon which the complainant was entitled to receive the larger amount, gave him a right to be informed of the rapidity and methods in which the money was being used to bring about the important final event.

By the terms of the contract the complainant could only realize anything upon the success of the search for the gold. Without the money advanced by Hartshorne and others, the search was impracticable. It was clearly understood and implied that the money would be used for the purposes of the

Thomas v. Hartshorne.

search. At what period of time, if ever, the search was likely to be successful, was always uncertain, and became more and still more dubious as time advanced. The chances of a successful termination of the work were dependent upon the length of the period during which it could be continued, and that was dependent upon the ability of Thomas to raise money, and upon the economy and judgment with which the money raised was applied. So, the complainant was entitled, not only to have the work continued, but entitled to know that the fund on hand had been and was being so dealt with that the work was likely to be continued the greatest possible length of time.

In addition, it may be remarked, that there was no certainty how long Thomas would be able to continue the work by means of future advances which he might receive.

He was, at frequent intervals, applying to those who had already put money into the venture for more money, upon the ground that his need of funds was urgent.

This was a strong inducement to risk more money to save that which had already been staked upon the result.

This was an additional reason why these persons should know what had become of the moneys already advanced.

I think, then, that there was existing a right to an accounting at the time of filing the original bill.

But it did not follow, from the existence of a right to an account, that the balance found to be due upon such accounting should be turned over to the complainant. It is clear, that, if it appears that the work had been prosecuted with reasonable diligence and economy, the unexpended balance of moneys advanced could not be diverted from the further prosecution of the venture.

But a new phase was given to the cause during its progress. A supplemental bill was filed, setting up a fact arising subsequent to the filing of the original bill, namely, the fact of the cancellation of the contract of Thomas with the government. The ground upon which the cancellation was determined by the government, or the justice or injustice of that act toward Thomas, we cannot enter into ; that is a matter resting between the govern-

Thomas *v.* Hartshorne.

ment and Thomas. The fact exists that the right to proceed with the work under the government was extinguished. This fact, taken along with the other facts set out and proved in the cause, shows that the further prosecution of the work became practically impossible to Thomas.

In this posture of affairs, it seems clear, that the balance remaining unexpended could not be applied to the purpose for which it was advanced, and the only equitable recipients of such balance are those who made the advancements.

For the purpose of ascertaining such unexpended balance, the decree for an account, made below, is correct; but in taking such an account, in the judgment of the court, the sum of $5,000, which appears to have been advanced by Thomas as a special loan, and for which security was taken by way of chattel mortgage, should be excluded from the moneys for which defendant should account.

In this respect the decree below should be modified.

PATERSON, J. (*dissenting*).

In this case, I have arrived at a conclusion at variance with the opinion of the court, and, for satisfactory reasons, shall vote to reverse throughout the decision below. I think the bill should be dismissed, because the circumstances disclosed by the evidence are of such a nature as to warrant no person, who had advanced money to promote an enterprise of a character so peculiarly speculative, to demand an account, or require repayment. He took all the risks of a venture so much beyond that of ordinary business, and upon failure is not entitled, on any principle of equity, to protection or redress. Judicial tribunals should not lend encouragement or countenance to investments so hazardous, but leave the persons who engage in such schemes to settle and adjust their own accounts, whether winners or losers.

*Decree unanimously modified.*